THE PEOPLE ex rel. William H. Stead, Attorney General,
Relator, vs. OLIVER M. OLSON, Respondent.

*Opinion filed April 19, 1913.*

1. DISBARMENT—*when attorney should not be disbarred.* The
fact that from an ethical standpoint the respondent should have
returned a ten-dollar fee to his client notwithstanding her per-
emptory and rude dismissal of him is not ground for disbarment,
where the proof shows that he had performed some services for
her and honestly believed he was entitled to the fee for the ser-
vices rendered.

2. The court reviews the evidence in this case, and agrees with
the finding and recommendation of the commissioner that the evi-
dence does not sustain the charges in the information and that the
rule be discharged.

INFORMATION to disbar.

W. H. STEAD, Attorney General, and D. B. SNOW,
(FRANK W. JOSLYN, of counsel,) for relator.

OLIVER M. OLSON, *pro se,* (L. H. GRANGE, of counsel,)

Mr. JUSTICE FARMER delivered the opinion of the court:

This was an information filed by the People, on the re-
lation of the Attorney General, for the disbarment of re-
spondent, Oliver M. Olson, a practicing lawyer residing in
Wheaton, Illinois, but having his office in Chicago. The
information contains five charges of unprofessional con-
duct, all but one of which grew out of the defense by re-
spondent of one William B. Davy, who was indicted, tried
and convicted of horse stealing at the October term, 1908,
of the circuit court of DuPage county. The other charge
was based upon his employment by Ivah Longcore, who
was in jail charged with larceny, her payment to him of
$10 to apply on his attorney's fee and his failure to per-
form any service for her. These charges will be more par-
ticularly referred to hereafter. Leave was given relator to

file the information and respondent was ruled to answer. The answer denied the charges set out in the information, except in certain details, and denied that respondent was guilty of unprofessional conduct in any respect. Upon the answer being filed the cause was referred to William R. Plum, special commissioner, to take the testimony and report his conclusions of law and fact. The commissioner took the testimony and reported the same with his conclusions and recommended that the rule be discharged. Relator filed objections to the findings and conclusions of the commissioner, which were overruled and by stipulation are made exceptions to the report.

The information charges that William B. Davy was indicted by the grand jury of DuPage county for horse stealing, arrested, and in default of bail was confined in jail to await his trial. Respondent was employed by Davy as counsel to defend him. The information charges that while so employed respondent made frequent visits to the jail to confer with Davy; that during these visits he took certain letters written by Davy to Catherine Waelchli, a sister of Davy, asking her to secure for him certain saws and acids for cutting chilled steel, and another letter asking her to secure for him several bars of a certain kind of green castile soap. The acids and saws were desired to cut the iron bars, by which Davy could escape from jail, and, the interior of the jail and bars being painted green, the soap was to be used in concealing the cuts until the escape was effected. The information charged that respondent concealed other letters about his person and delivered them to said Catherine Waelchli; that the acids and saws asked for in the letter were not secured, but that the green castile soap was given to respondent by Catherine Waelchli and by him delivered to the sheriff or his deputy with the request that it be given to Davy; that afterwards the attempted escape was discovered, and it was found that a strap of iron or steel had been loosened and removed and a number of

rivets removed, and that the castile soap had been used in filling the openings caused by the removal of the rivets. The information charges that respondent was aware of the plans for the escape from jail and had discussed the matter with Davy.

Davy was tried under the indictment returned against him for horse stealing in October, 1908, in the circuit court of DuPage county, convicted and sentenced to the penitentiary. He was defended by respondent, and on the trial Catherine Waelchli and her husband, Noah Waelchli, and one Molby, testified for the defense. The horse was stolen in Wheaton on March 17, 1907, and said witnesses testified they were with Davy in Chicago on that date and that he was not in Wheaton on the day the horse was stolen. After this testimony the witnesses were arrested, indicted and tried, and Catherine Waelchli and her husband were convicted of perjury for falsely testifying that Davy was not in Wheaton on the day the horse was stolen but was with them in the city of Chicago. The information charges that said witnesses were persuaded and induced by respondent to falsely testify to the *alibi* for Davy, knowing at the time such testimony was false. Respondent also defended the Waelchlis when they were put on trial for perjury, and the information charges the respondent advised and attempted to procure one Harry Peterson to testify in their behalf that he was with them and Davy in Chicago at the time the horse was stolen, for which Davy was convicted.

The testimony of Davy, Mr. and Mrs. Waelchli and one Hohlfelder, who was a fellow-prisoner with Davy in the DuPage county jail and who pleaded guilty to the charge of obtaining money under false pretenses and received a jail sentence, supported the charge in the information that respondent knew of and assisted in the plan of attempted jail breaking. Davy and the Waelchlis testified to the truth of the charge that respondent advised the Waelchlis to testify falsely as to Davy's whereabouts on the day the horse

was stolen, and their testimony is corroborated in some degree by Hohlfelder. Peterson testified that respondent advised him to testify for the Waelchlis that he was with them and Davy on the day the horse was stolen, knowing at the time the testimony would be false. The Waelchlis appear to have been conducting some kind of a traveling show and Peterson was one of their company or troupe. Davy and the Waelchlis admitted that the *alibi* they testified to on Davy's trial, and again on the trial of the Waelchlis, was false. The record of Davy, the Waelchlis and Hohlfelder was such as to very reasonably affect the credit that should be given their evidence. Besides, their testimony in itself bears evidence of unreliability, and it was so contradicted and weakened by evidence on the part of respondent that the commissioner held it unworthy of belief and insufficient to establish the charges in the information. After having read it ourselves we are unable to say the commissioner was not justified in this conclusion.

The Waelchlis were indicted for perjury at the October term, 1908, of the DuPage county circuit court, and respondent, representing them as their attorney, applied for and was granted a continuance of the case by Hon. D. J. Carnes, the judge then presiding. At the March term, 1909, Hon. Mazzini Slusser was the judge presiding, and the respondent applied for a change of venue on behalf of Noah Waelchli on account of the prejudice of the judge, and presented in support of the motion two affidavits of disinterested citizens. One was sworn to by Doris Stafford and the other by A. McIntyre. The application for change of venue and the affidavits appear to have been presented to the presiding judge before they were filed. The State's attorney of the county testified that the affidavits were handed by respondent to the judge, as he remembered it, and the judge handed them to the witness. The witness said he saw only one affidavit, and that it was sworn to by Stafford before Herrick, a justice of the peace and notary

public; that Judge Carnes' name had been erased from the affidavit by pencil or ink and over it was written the name of Judge Slusser. After some little talk the judge retired to his chambers and the State's attorney and respondent followed him. The witness said Judge Slusser told respondent the affidavit looked as if it had been tampered with and asked why his name was written in it; that respondent said he had written it in the affidavit, and in reply to a question from Judge Slusser said Stafford and Herrick knew nothing about his having written Judge Slusser's name in the affidavit. The judge said he thought it was a fraud on the court, and respondent said he did not so intend it; that it was his belief he had a right to make changes in it as he would in any pleading in the case. The judge handed the application for change of venue and the affidavits back to respondent, who, after consulting with his client, went to trial.

Judge Slusser testified that the matter occurred more than two years before he gave his testimony, and he could not remember clearly what was said when the application for change of venue and the affidavits were presented to him. He testified there were two affidavits accompanying the application, and one of them had the name of Judge Carnes in it, probably typewritten, and the witness' name written in in longhand. The judge asked respondent when that was done, and he said that morning, and in response to further questions said it was done without the knowledge of affiant. The judge stated to respondent that it could not be used as a basis for a change of venue, and that he expressed some doubt about whether the matter ought not to be presented to the grievance committee of the bar association. He retired to his chambers and respondent and the State's attorney came in. Respondent said he intended no wrong or fraud on the court; that as the affidavit had not been filed he thought he had the right to change it and intended no wrong by doing so. The judge told him if that

was so he could withdraw it if he desired. Respondent did withdraw it and after consulting with his client went to trial. The witness stated he did not know whose affidavit the one he examined and in which his name had been written over Judge Carnes' purported to be. He thought it was sworn to before Herrick but was not sure, and while, as he remembered it, his name was written in longhand he was not sure of that.

Respondent denied ever changing or admitting that he changed any affidavit presented in support of his motion for a change of venue. He testified that he intended applying for a change of venue in December, 1908, and procured the affidavit of McIntyre to support his application. That affidavit had in it the names of Judges Carnes and Slusser, but afterwards the name of Judge Carnes was stricken out or erased by McIntyre himself. The case was continued and the application for a change of venue was not then made. Respondent testified he contemplated asking for a change of venue at the March term, 1909, and prepared an application for that purpose; that he procured the affidavit of Stafford to support it, which was sworn to before Herrick on March 8, 1909; that he attached this affidavit and the McIntyre affidavit to the application for a change of venue, and these were the only affidavits he presented. He produced at the hearing before the commissioner what he testified were the application for a change of venue and the documents accompanying it, including the two affidavits mentioned, and testified they were then in precisely the same condition they were when presented to Judge Slusser. The McIntyre affidavit was sworn to before Herrick on December 7, 1908, and McIntyre testified it was the only affidavit he ever made for a change of venue in the case and that he erased the name of Judge Carnes from it. The affidavit of Stafford produced by respondent was sworn to before Herrick on March 8, 1909, which was the day the application for change of venue was made, and

there was no erasure in it of the name of Judge Carnes, over which was written the name of Judge Slusser. Stafford identified the affidavit as the one signed and sworn to by him before Herrick on the day it bore date and testified it was the only affidavit made by him for a change of venue, and that at the time of his testifying it was in the same condition as when he signed and swore to it. Herrick, the notary public before whom the affidavits of McIntyre and Stafford were sworn to, testified that on the day they were presented to Judge Slusser, and after all the papers presented to the judge had been prepared in connection with the application for a change of venue, he fastened them together at his office; that the affidavit of Stafford was sworn to before him on that day and the affidavit of McIntyre had been sworn to before him on the day it bore date; that the two affidavits presented by respondent were the same affidavits he fastened with the other papers on the day the application for change of venue was made, and that both were in the same condition they were in when he fastened them together with the other papers.

Under these circumstances we think the commissioner was justified in concluding that the charge of changing the affidavit had not been sustained. We make no question of the good faith of Judge Slusser and the State's attorney, but they admitted,—especially Judge Slusser,—that the matter having occurred at least two years before the testimony was heard, it was not fresh and clear in the minds of the witnesses.

With reference to the charge in the information against respondent for obtaining a check for $10 from Ivah Longcore under false pretenses, the substance of the proof is as follows: Ivah Longcore testified she was in the jail of DuPage county under the charge of larceny, for which she was afterwards convicted and served a sentence. While confined in jail, but before her trial, respondent was in the jail and she had a talk with him about her case. She tes-

258 - 19

tified she did not employ him to take charge of her defense but told him she would like to get out on bail and requested his assistance; that respondent asked her how much money she had, and she told him she had a check for $10. He told her if she would give him the check he would get her out on bail in two weeks, and she thereupon endorsed the check to him, upon which he subsequently received the cash. The witness testified she wrote some letters to friends in Michigan asking them to help her get out on bail and gave them to respondent to mail; that respondent did nothing for her and thereafter had no further interviews with her until she demanded the return of the check, and he refused to return it or give her the money, saying he had earned it by services rendered. Respondent admitted receiving the check and getting the money on it, but testified Ivah Long-core employed him to defend her and agreed to pay him $40 for doing so; that the check was a payment on the fee; that the woman wanted to get out on bail, and he sent let-ters, either written by her or by himself, to people in Michi-gan who were acquaintances and friends of the woman, asking help to get her out on bail. He subsequently re-ceived letters from two parties proposing to help her give bond, one of whom said he would furnish the security. Respondent testified that before he informed the Longcore woman of having received these letters,—but whether be-fore they were received by him is not clear,—he went to the jail to see his client, and as he approached the place where she was confined she slammed the door and told him there was nothing doing and refused to talk to him; that thereafter he had nothing further to do with her and never informed her of the letters he had received about bail. She appears never to have given bail but to have remained in jail until she was convicted, sentenced and served her term.

While we do not think the evidence sustains this charge in the information, respondent's own testimony shows that his conduct was not very commendable. The commissioner

found that he in good faith believed he was entitled to retain the $10 for services rendered, but that in a spirit of petulance because of his client refusing to further confer with him he withheld from her the results of his services in his efforts to procure bail for her; that from an ethical standpoint he should have returned to her the money received on the check; that this would probably have been the conduct of an experienced lawyer who had a proper appreciation of the ethics of the situation, but that in view of the conduct of respondent's client and her treatment of him the circumstances afforded no justification for disbarment. Respondent was admitted to the bar in 1906. He resided at Wheaton but had an office in Chicago and practiced law in DuPage county. He was a student four years in Wheaton College and a graduate of that institution. The president of Wheaton College and a professor who had taught in that institution about thirty years testified that respondent's general reputation for honesty and integrity in the neighborhood was good, and this was not disputed by any other testimony. The record shows respondent to be a man of rather irascible temper and tempestuous disposition. There had existed between him and the State's attorney and sheriff of DuPage county, for some time prior to the transactions out of which this proceeding originated, a very bitter feeling, and these unfriendly relations continued up to the time of the hearing before the commissioner. We do not mean to intimate that the charges in the information against respondent originated in malice and without any reasonable basis. We have no doubt of the good faith in which they were made, but they were not sustained by proof showing such moral turpitude or unprofessional conduct as would justify the destruction of respondent's professional life by his disbarment. The rules governing such cases and the proof necessary to justify disbarment have been stated in *People* v. *Harvey,* 41 Ill. 277, *People* v. *Matthews,* 217 id. 94, *People* v. *Barker,* 56 id. 299, *People* v.

*Sullivan,* 218 id. 419, *People* v. *Thornton,* 228 id. 42, *People* v. *Silha,* 252 id. 385, and other cases. Under the rule established by these decisions we agree with the commissioner that the charges in the information were not sustained by the evidence, and the rule is discharged.

*Rule discharged.*